Filed 6/28/23  P. v. Isaac CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>       Plaintiff and Respondent,<br><br>v.<br><br>NAKIA JAMES ISAAC,<br><br>       Defendant and Appellant. | B322493<br><br>(Los Angeles County<br>Super. Ct. No. VA151562) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Lee W. Tsao, Judge.  Affirmed.

Marta I. Stanton, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Scott A. Taryle and Stefanie Yee, Deputy Attorneys General, for Plaintiff and Respondent.

———————————

The jury found Nakia James Isaac guilty of assault by means of force likely to produce great bodily injury (Pen. Code,[1] § 245, subd. (a)(4); count 2). The jury found not true the allegation that Isaac personally inflicted great bodily injury pursuant to section 12022.7, subdivision (a), in connection with count 2. It found Isaac not guilty of battery with serious bodily injury (§ 243, subd. (d); count 1) and criminal threats (§ 422, subd. (a); count 3).

On appeal, Isaac contends that the evidence is insufficient to support the jury's finding that he used force likely to produce great bodily injury in the commission of the assault, and that the trial court abused its discretion when it refused to reduce his assault conviction to a misdemeanor pursuant to section 17, subdivision (b), or in the alternative, to grant probation.

We affirm the judgment.

**FACTS**

*Prosecution*

On July 9, 2019, victim Chad Rogers was making repairs on a house in Bellflower (the Bellflower house) owned by family members of his girlfriend, Heather Ives. Prior to Ives's relationship with Rogers, she had a relationship with Isaac, and Ives and Isaac have two children together. Ives and Isaac previously lived in the Bellflower house, until she moved out in July 2018 and he later moved out in February 2019.

Rogers was working outside on the side of the house when he was assaulted. At trial, he could not remember much of what happened to him. He recalled regaining consciousness and finding his phone on the ground. Rogers realized that his phone

_____

[1] All further statutory references are to the Penal Code.

was broken and that he was bleeding.  He felt dazed and confused.  He went inside the house and then came out to meet the sheriffs.  He was taken to the hospital, but he did not remember being there.

Shortly after the attack, Rogers told Los Angeles County Sheriff's Detective James Colbert that Isaac approached him and hit him on the back or the arm.  He believed that Isaac hit him with an object due to the force of the impact.  Isaac kicked him in the face.  As a result of the assault, Rogers suffered a broken nose, a severe concussion, a sprained back, and injuries to his ribs.  He had extensive bruising, which he identified in photographs at trial.  A photograph of Rogers at the hospital depicted a shoe mark on his face.  Rogers suffered lasting memory and balance impairment.

A neighbor's surveillance camera captured Isaac's truck passing by and then returning about 15 minutes later on the day of the assault.  The video shows a person exiting the truck and walking towards the Bellflower house, and then, about two minutes later, a person walking back to the truck.  Another person enters the camera view from the direction of the house and sits on the curb.  A police car pulls up approximately five minutes later.

A neighbor walked by the Bellflower house on the day of the assault.  The neighbor heard a female in a truck yelling, "Stop it."  There was banging at the side of the house, and the neighbor could hear men's voices yelling and a fence being shaken and knocked.  She called the police.  The neighbor saw someone get into the truck and leave.  Rogers came out of the house holding his head and asked for help.  He had a lump on his head and was bleeding.

3

Detective Colbert interviewed Isaac on August 21, 2019.[2] Isaac said that on the day of the assault he picked his daughter up from school and they drove to the Bellflower house to look at the garden. Rogers approached Isaac's truck, threatened Isaac, and hit him in the face. Isaac and Rogers engaged in a mutual fight while Isaac's daughter remained in the truck. Isaac returned to the truck and drove away. He told Detective Colbert that he had not gone by the house before the fight occurred. The detective advised Isaac that the houses nearby had cameras, and that the video did not show Rogers approaching Isaac's truck. Isaac insisted that Rogers approached the truck.

### Defense

Isaac's 18-year-old daughter, Cameron,[3] testified in his defense. Isaac picked her up from summer school on the day of the fight. Cameron and Isaac were parked on the street looking at the garden at the Bellflower house when Rogers approached the truck, put his hand through the window and punched Isaac. He pulled Isaac out of the truck and attacked him. The two men fought on the side of the house. Afterwards Isaac drove to the stop sign, turned the corner, and stopped in front of the house. Isaac exited the truck and walked to a window of the house. When Isaac started walking back to the truck, Rogers came out of a side gate and Isaac walked toward him. Rogers got Isaac in a headlock, and the men fell to the ground fighting. Cameron yelled for them to stop and Isaac returned to the truck. Isaac was

---

[2] A recording of the interview was played for the jury.

[3] We refer to Cameron Isaac by her first name, as she shares a last name with Isaac.

4

injured in the confrontation. His face was swollen, he had a black eye, and there was skin missing on the back of his hand.

Cameron had a closer relationship with Isaac than with her mother, and Cameron worried about what would happen to her father after the trial. She had not spoken to her mother since the day her father was arrested. Cameron would not lie for Isaac. When confronted with video recordings of the time in question, Cameron acknowledged that the video did not show the truck parked in front of the garden or Rogers approaching the truck. It depicted her father exiting the truck. Cameron admitted that she may have told an investigator that Isaac got out of the truck, opened the gate, and began fighting with Rogers. She might not have told the investigator that Rogers got Isaac in a head lock.

Isaac testified that when he and Cameron stopped at the Bellflower house to look at the garden, Rogers approached his truck and the two argued. Rogers reached through the truck's window and punched Isaac in the face. Isaac drove to the corner and turned. He saw Rogers in the house. Isaac exited the truck and walked down the walkway, then turned to walk back to the truck. Rogers was standing at the gate. Isaac approached and they began to argue. Rogers punched Isaac and the two began fighting. As Isaac was opening the gate, Rogers got him in a headlock. Isaac began punching Rogers in the midsection and they wrestled on the ground. He may also have kicked Rogers. The fight was a "[m]ixed martial arts," "ground-and-pound" fight without rules. Cameron yelled for Isaac to go, so Isaac "just [got] in the car and went on with [his] day." Isaac had a black eye and he had cuts inside his cheek and on his hand. Rogers was not unconscious when Isaac left. Isaac did not call the police because

he felt it was a mutual fight that he won, and he did not intend to press charges.

### Self-defense Instruction

As relevant here to Isaac's appeal of the conviction for assault by means of force likely to produce great bodily injury, the court instructed the jury on Isaac's theory that he acted in self-defense.   Specifically, the court instructed the jury that among the elements that the prosecution had to prove was that Isaac "did not act in self-defense."

## DISCUSSION

### Sufficiency of the Evidence

When reviewing for sufficiency of the evidence, the " ' "court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " ' " (*People v. Casares* (2016) 62 Cal.4th 808, 823; see *Jackson v. Virginia* (1979) 443 U.S. 307, 321 [federal due process requires proof "sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt"].)  " 'The standard of appellate review is the same in cases in which the People rely primarily on circumstantial evidence.' [Citation.] '. . . [I]t is the jury rather than the reviewing court that weighs the evidence, resolves conflicting inferences and determines whether the People have established guilt beyond a reasonable doubt.' " (*Casares*, at p. 823.)  On appeal, " '[w]e do not reweigh evidence or reevaluate a witness's credibility.' " (*People v. Scott* (2011) 52 Cal.4th 452, 487.)

6

"Section 245 'prohibits an assault by means of force *likely* to produce great bodily injury, not the use of force which does in fact produce such injury. While . . . the results of an assault are often highly probative of the amount of force used, they cannot be conclusive.' [Citation.] Great bodily injury is bodily injury which is significant or substantial, not insignificant, trivial or moderate. [Citations.] ' "The crime . . . , like other assaults may be committed without infliction of any physical injury, and even though no blow is actually struck. [Citation.] The issue, therefore, is not whether serious injury was caused, but whether the force used was such as would be likely to cause it." ' [Citation.] The focus is on the force actually exerted by the defendant, not the amount of force that could have been used. [Citation.] The force likely to produce bodily injury can be found where the attack is made by use of hands or fists. [Citation.] Whether a fist used in striking a person would be likely to cause great bodily injury is to be determined by the force of the impact, the manner in which it was used and the circumstances under which the force was applied." (*People v. McDaniel* (2008) 159 Cal.App.4th 736, 748–749.)

Here, the injuries Rogers sustained as a result of the assault support the jury's finding that Isaac used force likely to cause great bodily injury. Rogers had a broken nose, a severe concussion, a sprained back, and injuries to his ribs, which is highly probative evidence supporting the jury's finding of force likely to produce great bodily injury. The record further contains evidence that the manner and force of impact, and the circumstances support the finding: Rogers told law enforcement that Isaac hit him *from behind* so hard that he thought Isaac *must have hit him with an object*. Rogers also told officers that

7

Isaac kicked him in the face with his foot. A photograph taken of Rogers at the hospital depicted a shoe mark on his face. Isaac's attack on Rogers culminated with Rogers lying on the ground unconscious. Rogers suffered lasting memory and balance impairment, which were still affecting him at the time of the trial. Isaac's own testimony lends further support to the jury's findings. He admitted he punched Rogers repeatedly in the midsection, and that he "may have" kicked Rogers. He described the assault as a "[m]ixed martial arts" style, "ground-and-pound" fight, and testified, "It's not like there were any rules." Afterwards, Isaac "just [got] in the car and went on with [his] day." The jury could reasonably infer that the manner in which Isaac knocked Rogers to the ground, and kicked and hit him in vital parts of the body, involved force likely to cause great bodily injury.

### Motion to Reduce Felony to Misdemeanor or Grant Probation

Isaac contends that the trial court abused its discretion by refusing either to reduce his felony conviction for assault by means of force likely to cause great bodily injury to a misdemeanor, or to grant Isaac probation. The contention lacks merit.

" 'The Legislature has classified most crimes as *either* a felony or a misdemeanor, by explicitly labeling the crime as such, or by the punishment prescribed.' [Citation.] However, there is a special category of crimes that is punishable as either a felony or a misdemeanor, depending on the severity of the facts surrounding its commission. [Citation.] These crimes, referred to as 'wobbler[s],' are 'punishable either by a term in state prison or by imprisonment in county jail and/or by a fine.' " (*People v.*

8

*Tran* (2015) 242 Cal.App.4th 877, 885.) "Assault by means of force likely to produce great bodily injury is a wobbler." (*Ibid*.)

"A trial court has discretion to reduce an assault to a misdemeanor at the time of sentencing. ( . . . § 17, subd. (b)(1), (3).) Factors relevant to the trial court's decision include ' "the nature and circumstances of the offense, the defendant's appreciation of and attitude toward the offense, [and] his traits of character as evidenced by his behavior and demeanor at the trial." ' (*People v. Superior Court* (*Alvarez*) (1997) 14 Cal.4th 968, 978 (Alvarez).) Courts may also consider the sentencing objectives set forth in California Rules of Court, rule 4.410. (*Alvarez*, at p. 978.) Those include protecting society, punishing the defendant, deterring crime, encouraging the defendant to lead a law-abiding life, and preventing the defendant from committing new crimes. (Cal. Rules of Court, rule 4.410(a).) The trial court's discretion under . . . section 17, subdivision (b) is broad, and it will not be disturbed on appeal unless it is clearly shown the decision was irrational or arbitrary. (*Alvarez*, at p. 977.) Absent such a showing, we presume the trial court acted to achieve legitimate sentencing objectives." (*People v. Dryden* (2021) 60 Cal.App.5th 1007, 1027–1028.) The court's discretion to decide whether to grant probation is similarly broad. (*People v. Clancey* (2013) 56 Cal.4th 562, 579.)

In this case, the trial court concluded that Isaac was not truthful in his testimony. The court stated, "This was not just an incident that involved a fight between Mr. Isaac and Mr. Rogers . . . [Isaac's] testimony in this trial would lead a reasonable juror to conclude that he was lying. And there were numerous inconsistencies in Mr. Isaac's testimony." The court was also troubled at the possibility that Isaac induced his

daughter—whose testimony was inconsistent with video evidence—to lie for him. The court did not believe that Isaac's behavior was out of character. The evidence indicated that he was duplicitous and hid his bad behavior from the people who supported him. The court concluded that it was necessary to hold Isaac accountable for his actions. The court observed that although Isaac could "move on," the injuries that Rogers suffered to his memory and balance would be lasting. Isaac needed to learn from his actions, and the court deemed him deserving of the sentence that it imposed.

Isaac does not identify any factor that the court should have considered that it did not. Nor does Isaac identify as improper a specific kind of evidence that the trial court did consider: Isaac's character, his demeanor at trial, the nature of the offense, and the adequacy of punishment were all appropriate factors to assess in the court's exercise of discretion to designate the assault as a misdemeanor. Such evidence was also appropriate for consideration by the court when deciding whether to grant probation. Rather, Isaac makes a conclusory argument that the trial court interpreted the trial evidence in a manner that was inconsistent with the jury's verdicts acquitting him of battery with serious bodily injury and criminal threats, and the jury's not true finding on the great bodily injury enhancement. We see no inconsistency. The only specific jury finding the court referenced at sentencing was the jury's rejection of Isaac's claim that he acted in self-defense, which was unquestionably correct. The court noted that the jury's rejection of that led to a "possibility that [Isaac] induced his daughter to lie" in support of that defense, a matter that called into question Isaac's character. Without characterizing Rogers's injuries in terms of any legal

10

standard, the court repeated Rogers's testimony about the continuing adverse health consequences from the assault. The jury's verdicts tell us nothing about whether they accepted or rejected that testimony, and the court was not precluded from reaching the conclusion that while Isaac claims to have moved on, his victim Rogers could not. The court was not prohibited from concluding that the force used was likely to cause great bodily harm, as such a finding may be made even where no bodily harm has been suffered. (*People v. McDaniel*, *supra*, 159 Cal.App.4th at p. 748.) The trial court did not abuse its discretion.

**DISPOSITION**

We affirm the judgment.

NOT TO BE PUBLISHED.


MOOR, J.

We concur:



RUBIN, P. J.



BAKER, J.